# FOR PUBLICATION



ATTORNEYS FOR APPELLANT:

**DONALD G. ORZESKE**
**STEPHANIE M. PAYNE**
Goodin Orzeske & Blackwell, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**KAREN T. MOSES**
**SHANNON K. REED**
Faegre Baker Daniels LLP
Fort Wayne, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JAMES R. SAPP, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No.  49A02-1311-PL-935 |
| | ) | |
| FLAGSTAR BANK, FSB, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Theodore M. Sosin, Judge
Cause No. 49D02-0606-PL-26834

**June 26, 2014**

**OPINION–FOR PUBLICATION**

**BAKER, Judge**

This case is before us again, following an order on remand regarding appellee-plaintiff Flagstar Bank's (FSB) cause of action against appellant-defendant James R. Sapp for breach of contract. In the original appeal, a different panel of this Court determined that although the trial court erred in entering summary judgment on the breach of contract claim regarding a check in the amount of $125,000 that FSB ultimately lost, it was determined that FSB was entitled to summary judgment on the remaining claims that included theft and unjust enrichment. Sapp v. Flagstar Bank, 956 N.E.2d 660 (Ind. Ct. App. 2011).

After remand and following a bench trial, Sapp now appeals the trial court's judgment, challenging a number of the trial court's findings. Specifically, Sapp alleges that FSB erroneously "charged back" to his account under various provisions of the Uniform Commercial Code and a Deposit Account Disclosure Agreement (Agreement) that he executed with the bank. Alternatively, Sapp asserts that the trial court improperly found that he suffered no loss in light of FSB's purported unreasonable delay in notifying him of the lost check. Thus, Sapp argues that he is entitled to a setoff of the judgment in the amount of the charge back because of FSB's loss of the check and maintains that the trial court erroneously held him personally liable for shortages in the account because he was only acting in a representative capacity as a corporate shareholder. Finally, Sapp challenges the trial court's decision to award FSB its attorney fees and costs.

2

We conclude that the evidence presented at trial supported Sapp's liability and the "charge back" to the account in accordance with the UCC and the Agreement. We also conclude that Sapp is not entitled to a "set off" in the amount of the charge back to his account. Sapp is personally liable for the loss of the funds and we also find that the trial court properly awarded FSB its attorney fees and costs in this action. However, we remand this cause for further proceedings so that the trial court may decide the proper amount of appellate attorney fees that should be awarded to FSB in accordance with the Agreement.

The judgment of the trial court is affirmed and remanded for further proceedings consistent with this opinion.

FACTS[1]

Although many of the circumstances in this case are more fully set out in the original Sapp opinion, the evidence at trial following remand established that sometime in 2004, Sapp approached Peter Joines, an FSB regional manager in charge of expanding FSB branches in Indiana, about renting some office space that Sapp and his family owned.

FSB eventually opened a branch in Castleton and negotiated lease space directly from Sapp. Joines became an assistant vice president and division manager of FSB. When Joines went to FSB, he frequently spoke with Sapp as FSB's landlord.

---

[1] We heard oral argument in this case on June 4, 2014, in Indianapolis. We commend counsel for their able presentations.

In July 2005, Sapp formed an LLC that consisted of various members of his family. That year, Sapp opened an account with FSB that was termed the "SF7 Account," which was also part of the LLC. Appellant's App. p. 5-51. The LLC was formed for the purposes of purchasing real estate in Bloomington and for other investments. Id. The members of the company are Sapp, his wife, and Sapp's mother. Sapp initially deposited $560.53 into that account in August 2005, and he was the sole signor on that account. Sapp held interests in numerous other banks, including several out-of-state institutions.

On August 23, 2005, Sapp deposited a check in the amount of $125,000 into the SF7 Account. Sapp originally claimed that he could not identify the account on which that check was drawn. However, while Sapp was able to "narrow it down," he could still not identify "which account the $125,000 check came from" as of November 2007. Appellant's App. p. 5-53. In January 2008, Sapp ultimately testified that his prior statements had been incorrect, and the check was actually a cashier's check that he obtained from an unidentified bank "with whom he had a banking relationship." Id.

At the time of the transaction, Sapp presented FSB with a deposit slip that identified the $125,000 deposit as a check. In turn, Sapp was given a receipt informing him that "ALL DEPOSITS/PAYMENTS ARE SUBJECT TO PROOF. . . ." Consistent with the terms of the Agreement, Sapp was given provisional credit for the deposit. Appellant's App. p. 5-54. Thus, the SF7 Account reflected a balance of $125,560.53.

4

FSB lost the check, and its representatives contacted Sapp asking for his assistance in identifying the maker of the check. While the parties disagree as to when FSB first notified Sapp that the check was missing, the evidence pointed to the conclusion that Sapp was notified about the check sometime in September or early October of 2005 at the latest. It was also established that Sapp wanted to move the money to a "safer" bank, and that occurred within two weeks of a conversation that Sapp had with one of the bank representatives.

Almost all of the money in the SF7 account was withdrawn from that account on September 9, 2005, which was only sixteen days after Sapp deposited the $125,000 check. On that same day, Sapp wrote a $100,000 check from the SF7 account and moved those funds to an A.G. Edwards account. Thus, it is apparent that Sapp transferred the funds shortly after the deposit was made. Sapp claims that when he was first notified of the missing check, the SF7 account contained only about $8,600.[2]

At trial, and for the first time since this case has been pending, Sapp asserted that FSB failed to prove that the check was actually lost. Sapp did not provide contrary evidence or engage in any discovery; he never deposed any agent or employee of FSB. Rather, Sapp listed several documents—that he stated were never received from FSB— including a balance sheet, forensic audit, and "bad check loss sheet." Appellee's Br. p. 6. Although FSB's financial records were available for review, Sapp never sought them. Sapp seemed to indicate that his asserted failure to receive documentation from FSB

---

[2] It follows that if Sapp's testimony is to be believed and he moved the funds to a "safer" bank, he did so within two weeks after notice by FSB, he received notice shortly after the deposit was made. Id. at 5-55.

should stand as proof that the check was never actually lost. Put another way, Sapp's assertions seemingly indicated that FSB never actually lost the check.

On the other hand, Joines testified via deposition solely in his capacity as a prior employee and fact witness. He continued to press Sapp through the fall of 2005 for information regarding the missing check by inquiring about the status of the investigation into the identification of the maker and the possibility of obtaining a replacement check.

Sapp insisted that he was "working on it," but on November 9, 2005, Sapp told Joines that he could still not find a copy of the missing check but stated that he was looking into it and "there are several possibilities, I made several calls out of town [to] check on it." Id. at 5-57. However, Sapp could not identify who he had contacted. Sapp only stated that he called two banks but never actually spoke to anyone at those institutions.

On November 11, 2005, FSB debited $125,000 from Sapp's SF7 account. By that time, Sapp had withdrawn almost all of the funds. In addition to the $100,000 A.G. Edwards check, Sapp also made payments to a golf resort, various telephone service providers, Capital One, and a Mastercard account. Thus, FSB was only able to recover $1,965.37 from the SF7 Account.

Sapp repeatedly testified, both in an affidavit and at trial, that he "personally never received any of the funds from the $125,000 deposit." Id. at 5-56-57. At the same time, however, Sapp admitted that the $100,000 check that was drawn on the account

6

was made to A.G. Edwards. When the transaction occurred, the only A.G. Edwards accounts that Sapp identified were in his name.

On November 17, 2005, Amy Martin from FSB spoke with Sapp. Sapp emailed Martin and stated that the check should have been drawn on one of three different accounts. Sapp did not identify the accounts to FSB; however, at a later point in the litigation, Sapp testified that each of those accounts were "possibly" FSB accounts. Id. Although Sapp had access to those account records, he did not review the documents in response to FSB's repeated requests for information. Rather, Sapp testified that he reviewed his account statements only when he originally received them and again the week prior to his deposition in January 2008.

Joines again asked Sapp about his efforts to identify the maker and obtain a replacement check. Sapp informed Joines that he had done some "research in Bloomington," indicated that "the maker is out of town," and that "they will place a stop payment and re-issue." According to Sapp, he concluded that the $125,000 check had been written on one of the LM Sapp Trust accounts. Sapp admitted that if the check had been written on the LM Sapp Trust account, he, as signor on the Trust account, could have placed a stop payment on the missing check and reissued the check at any time.

On December 7, 2005, Joines again emailed Sapp and asked about the status of Sapp's efforts to obtain a replacement check. Sapp simply responded, "Out of state, Will check later." Id. Sapp testified during a deposition that he thought about it more and realized that the check was, in actuality, a cashier's check comprised of monies from

7

a variety of sources including a check from Security National Bank of Omaha for over $80,000; a check from a First Bank of Omaha for an amount "in the high 20s or low 30s," and various other checks paid to either "Sapp Leasing Company," another company entitled "eSapp," or to a company called "Chancellor Financial," plus some unidentified amount of cash. Id.

Sapp still could not identify the bank that issued the cashier's check or recall whether that particular bank had required him to deposit any of these out of state checks payable to various entities or whether the bank that he used had simply exchanged the checks that he provided for a cashier's check. Moreover, Sapp could not identify the remitter of the check. Sapp further testified that he called someone at a bank but was not able to remember with whom he spoke. Appellant's App. p. 5-58.

Sapp testified that he made inquiry with a few banks that held some of his accounts. Sapp stated that he asked the Bank of Indianapolis, National City and NBD if they had any records of a cashier's check provided to "[S]app or some of the entities, in the summer of '05." Id. at 5-58-59. All three banks stated that they had no records of providing Sapp with a cashier's check. Sapp did nothing further to identify the bank that issued the cashier's check or the possible remitter. Moreover, Sapp did not identify any efforts that he made to review deposit records from any of the banks.

The Agreement that Sapp executed with FSB provided in part that

AGREEMENT—This document, along with any other documents we give you pertaining to your account(s), is a contract that establishes rules which control our

8

account(s) with us.  Please read this carefully.  If you sign the signature card or open or continue to have our account with us, you agree to these rules.

Appellant's App. p. 5-60.

Sapp executed signature cards for the ten accounts that he opened at FSB.  The Agreement also stated that the account holder "agreed to be jointly and severally liable for any account shortage resulting from charges or overdrafts, whether caused by you or another with access to this account."  Id. at 5-60-61.  The Agreement went on to note that "DEPOSITS—We will give only provisional credit until collection is final for any items, other than cash, we accept for deposit."  Id.  Another section of the Agreement stated

> LIABILITY—You agree, for yourself (and the person or entity you represent if you sign as a representative of another) to the terms of this account and the schedule of charges.  You authorize us to deduct these charges directly from the account balance as accrued.  You will pay any additional reasonable charges for services you request which are not covered by this agreement.
>
> Each of you also agrees to be jointly and severally (individually) liable for any account shortage resulting from charges or overdrafts, whether caused by you or another with access to this account.  This liability is due immediately, and can be deducted directly from the account balance whenever sufficient funds are available.  <u>You have no right to defer payment of this liability, and you are liable regardless of whether you signed the item or benefited from the charge or overdraft.  This includes liability for our costs to collect the deficit including, to the extent permitted by law, our reasonable attorneys' fees</u>.

Id. at 5-61 (emphasis added).

> UNCOLLECTED AND NON-SUFFICIENT FUNDS—Your account will be overdrawn if a check or an item is charged against, or a withdrawal or transfer is made from your account for more money than you have in your account.  At the Bank's discretion, we may return any such transaction if there are uncollected funds or an insufficient balance in your Account to pay this transaction. . . .

9

The charges for each check or item returned or paid on an Account that has uncollected funds, non-sufficient funds or is overdrawn are listed in our Service Charge Schedule. <u>Additionally, you agree to reimburse the Bank immediately, upon demand, for the dollar amount your Account is overdrawn and related costs, expenses and reasonable attorney's fees (including the cost of any attorney employed by us)</u>.

### YOUR ABILITY TO WITHDRAW FUNDS

. . .

Our policy is to delay the availability of funds from your cash and check deposits. During the delay, you may not withdraw the funds in cash and we will not use the funds to pay checks that you have written. Please remember that even after we have made funds available to you, and you have withdrawn the funds, you are still responsible for checks you deposit that are returned to us unpaid and or any other problems involving your deposit.

### LONGER DELAYS MAY APPLY

Funds you deposit by check may be delayed for a longer period under the following circumstances:

We believe a check you deposit will not be paid.

You deposit checks totaling more than $5,000 on any one day. . . .

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. They will generally be available no later than the eleventh business day after the day of your deposit.

On May 30, 2007, FSB filed a complaint against Sapp for breach of contract, theft, conversion and unjust enrichment. As noted above, we reversed the trial court's grant of summary judgment in FSB's favor on the contract claim and remanded the matter for trial on that issue. We affirmed the trial court's grant of summary judgment as to the remaining claims.

10

The parties agreed to bifurcate the trial that related to the issue of attorney fees, pending a determination of liability for the purposes of the trial. Following a bench trial on February 27, 2013, the trial court found for FSB on the breach of contract claim. In addition to the facts set forth above, the trial court issued sixty-five findings of fact and conclusions of law, determining that

<u>FINDINGS OF FACT</u>

. . .

14. In January 2008, . . . Sapp testified that his prior statements [about the check] had been incorrect and the check was actually a cashier's check that he obtained from an unidentified bank with whom he had a banking relationship.

. . .

18. Sapp contends that he was not notified until October 27, 2005. Because Joines and King both spoke with Sapp at least several weeks earlier than the October 27, 2005 date, Joines opined that October 27, 2005 date was the date on which the "official notice from the deposit services of the bank was delivered to Sapp."

. . .

20. Almost all of the money in the SF7 account was withdrawn from that account on September 9, 2005, just . . . 16 days after Sapp deposited the $125,000 check. On September 9, 2005, Sapp wrote a $100,000 check from the SF7 account. . . . By the end of September 2005, well before the October 27, 2005 date, Sapp claims he was first notified of the missing check, the SF7 account contained only $8,613.73. As a result, if Sapp's testimony is to be believed and he moved his funds to a "safer" bank within two weeks after notice by Flagstar, he received notice shortly after the deposit was made.

. . .

26. On November 11, 2005, Flagstar debited the SF7 Account in the amount of $125,000. As stated, by that time, Sapp, who was the only authorized signer on the account, had withdrawn almost all the funds.

11

27. Sapp repeatedly testified both in affidavit and at trial that he "personally never received any of the funds from the $125,000 deposit." At the same time, however, Sapp admitted that the $100,000 check that was drawn on the account was made payable to A.G. Edwards. (Pl. Ex 10, p. 53). At that time, the only A.G. Edwards accounts identified by Sapp were solely in his name.

. . .

31. Sapp never did identify the maker of the check, never reissued a check, or otherwise paid the $123,034.63 deficiency. Despite this fact [FSB] never attempted to "set-off" the deficit against any other Sapp account.

. . .

33. Sapp could not identify the bank which issued the cashier's check or recall whether that bank had required him to deposit any of these out of state checks payable to various entities or whether the bank he used had simply exchanged the checks he provided for a cashier's check. Sapp could not even identify the remitter of the check.

## CONCLUSIONS OF LAW

. . .

9. The contract between the parties is the Disclosure. The Disclosure contains a number of provisions which require [FSB's] account holders to make [FSB] whole for losses suffered as a result of charges against a holder's account. . . . [Sapp] stated that he received and agreed to the terms of the Disclosure.

. . .

11. As the account holder, Sapp is individually liable "for any account shortage resulting from charges or overdrafts, whether caused by you or another with access to the account. . . ."

. . .

13. On November 11, 2005 [FSB] withdrew provisional credit and charged the SF7 account for the amount of the lost check because Sapp had already, by that time, written checks and made other withdrawals and the SF7 account contained only $1,965.37. As a result, [FSB] was only able to recover $1,965.37 of the $125,000 provisional credit. Under the plain meaning of the words in the Disclosure, the resulting negative balance of $123,034.63 was an overdraft for which Sapp was individually liable.

. . .

12

16. Sapp asserted at trial for the first time that there was no evidence that the $125,000 cashier's check was actually lost. Sapp implied any number of alternate theories including that an [FSB] employee could have absconded with the check. Sapp did not, however, produce any evidence in support of these theories.

17. Sapp also asserted at trial that he did not receive any of the $125,000 personally and that all of the funds were spent in the ordinary course of SF7's business. Sapp concluded that, as a result, he can have no personal liability for repayment for those funds. The Court holds that the $100,000 payment to Sapp's AG Edwards account was a payment made for Sapp's personal benefit. That payment was also, therefore, not in the ordinary course of business for SF7. Regardless, however, of the use of the funds at issue, Sapp is personally liable for any shortage in the account. . . . [U]nder the terms of the Disclosure, Sapp accepted personal liability for an account shortage.

18. Sapp has asserted that, under the terms of the Disclosure and I.C. § 26-1-4-215, [FSB] was required to notify Sapp by no later than midnight of the 11th day after deposit that the check had been lost. Sapp asserts that absent timely notice of the loss, [FSB's] "provisional credit" became final credit and that once the credit became a final credit [FSB] was without a remedy against Sapp.

19. The Court of Appeals embraced this theory based on Sapp's assertion that the $125,000 check came from another one of Sapp's accounts at [FSB]. If the missing check had been drawn on an [FSB] account, under the UCC, [FSB] was both the drawer and payor bank and, as a result, had two options. [FSB] could either notify Sapp by no later than midnight of the 11th day after deposit that the check was missing or it could notify him at a later date if it could prove that the delay in notification was reasonable under the circumstances. I.C. § 26-1-4-301.

20. In this case, however, while Sapp's trial testimony regarding the withdrawal of his funds from [FSB] raises a factual issue as to the date upon which he actually received notice of the missing check, the Court is not required to resolve that issue. Rather, Sapp has affirmatively stated that the $125,000 check was not drawn on another [FSB] account. Rather, Sapp has affirmatively stated that the $125,000 check was a cashier's check that was obtained from an unidentified bank. Sapp made a half-hearted attempt to suggest that the cashier's check could have been drawn on FSB, but as the proponent of that theory, the burden was on Sapp to prove that the cashier's check was drawn on [FSB]. Lacy v. White, 288 N.E.2d 178.

13

21. Sapp introduced no evidence in support of the assertion that the cashier's check could have been drawn on [FSB], but rather stated that he could not identify the bank from which he obtained the cashier's check. Sapp stated that the check could have been drawn on any of the [14] with which he was then in a banking relationship. Sapp failed to prove that the cashier's check was drawn on [FSB].

22. Moreover, even if [FSB] was the issuer of the cashier's check, FSB would still not be both the drawer and payor bank under the UCC. I.C. § 6-1-3.1-312 relates specifically to lost cashier's checks. Under that section, the issuer of a cashier's check is not called a payor bank, but rather the "obligated bank." I.C. § 26-1-3.1-312(a)(4) states: (4) "obligated bank" means the issuer of a cashier's check or teller's check or the acceptor of a certified check. As a result, when the item at issue is a cashier's check as opposed to a personal or business check, there is no 'payor" bank as that term is referenced in I.C. § 26-1-4-301.

23. [FSB] is not prohibited from taking longer than the notice period stated in the Disclosure within which to notify Sapp of the lost check. The only caveat is that, if [FSB] does take longer than the stated period, [FSB] bears responsibility for any damages suffered by Sapp as a result of the additional delay period. . . .

24. In this case, Sapp asserted no damage of any kind, never mind a loss resulting from the alleged delay in notice to him. On the contrary, in this case, Sapp specifically testified that he withdrew his monies from [FSB] within two weeks of receipt of notice of the lost check, including almost all of the $125,000 at issue in this case. Sapp has had the use of those monies since the fall of 2005. Sapp has not suffered any damage and [FSB] is not prohibited from revoking the settlement and obtaining a refund from Sapp.

25. Moreover, a further review of I.C. § 26-1-3,1-312 demonstrates just how easy it would have been to recover the missing $125,000 had Sapp simply identified the bank back in 2005 in response to [FSB's] inquiries. Pursuant to I.C. § 26-1-3.1-312, all Sapp would have had to have done was to make a claim to the issuing bank and, assuming the check was not cashed within 90 days, the bank would have reissued the check to Sapp.

26. Sapp is in breach of the Disclosure. [FSB] is entitled to recover $123,034.63 from Sapp.

27. [FSB] is also entitled to prejudgment interest at the rate of 8% from November 11, 2005 to date of entry of judgment in this matter.

14

28. In addition, pursuant to the terms of the Disclosure, FSB is entitled to reimbursement of reasonable attorneys' fees incurred in this matter.

Appellant's App. p. 5-66-20 (emphasis added). Sapp now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

As the plaintiff in the action, FSB has the burden of proving the elements of its claims by a preponderance of the evidence. PSI Energy, Inc. v. Roberts, 834 N.E.2d 665, 667 n.5 (Ind. 2005). A judgment in favor of a party having the burden of proof will be affirmed if the evidence was such that a reasonable trier of fact could conclude that the elements of the claim were established by a preponderance of the evidence. Park Jefferson Apartments v. Storage Rentals, 738 N.E.2d 685, 688 (Ind. Ct. App. 2000).

Similarly, the defendant has the burden of proving alleged affirmative defenses by a preponderance of the evidence. Lacy v. White, 153 Ind.App. 504, 515, 288 N.E.2d 178, 185 (1972). An affirmative defense is a defense upon which the proponent bears the burden of proof and which, in effect, admits the essential allegations of the complaint, but asserts additional matter barring relief. GKC v. Indiana Theaters, Inc. v. Elk Retail Investors, LLC, 764 N.E.2d 647, 653 (Ind. Ct. App. 2002). The party with the burden of proof may, in some instances, rely on inferences in the absence of direct evidence. However, those inferences must be reasonable. See Fowler v. Campbell, 612 N.E.2d 596, 602 (Ind. Ct. App. 1993).

15

We also note that in a breach of contract case, the initial burden of proof requires production of the contract and a demonstration that the amount sought is derived from the contract's terms. See Brown v. Guinn, 970 N.E.2d 192, 196-97 (Ind. Ct. App. 2012) (observing that the plaintiff must demonstrate simply the existence of the contract, breach of contract and resulting damages). In other words, the plaintiff may rely on what the contract states. See id.

Also, when the trial court enters findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A), we apply a two-tiered standard of review. In re Visitation of M.L.B., 983 N.E.2d 583, 585 (Ind. 2013). We must first determine whether the evidence supports the findings, and second, whether the findings support the judgment. K.I. ex rel J.I. v. J.H., 903 N.E.2d 453, 457 (Ind. 2009). We will set aside findings of fact and conclusions of law only if they are clearly erroneous, and due regard shall be afforded the trial court to judge the credibility of witnesses. M.S. v. C.S., 938 N.E.2d 278, 281-82 (Ind. Ct. App. 2010). A judgment is clearly erroneous when the record contains no evidence supporting the findings, the findings fail to support the judgment, or when the trial court applies an incorrect legal standard to properly found facts. Id. at 282. When applying the standard of review, we neither reweigh the evidence nor assess witness credibility and will consider only the evidence most favorable to the judgment. Clark v. Crow, 778 N.E.2d 835, 840 (Ind. Ct. App. 2002).

16

## II.  Sapp's Claims

### A.  Trial Court's Determination of FSB's Negligence

Sapp contends that the evidence demonstrated that FSB was the entity in control of the check and for a significant period of time—well beyond the deadlines set forth in the Agreement—failed to provide him with notice or revoke the provisional credit that was granted for the $125,000 check.   In short, Sapp argues that FSB had many opportunities to discover its error, and it "acted negligently" in losing the check. Appellant's Br. p. 10.  Moreover, Sapp asserts that the trial court erred in concluding that the funds from the SF7 account went into his individual accounts.  Thus, Sapp argues that the trial court's findings are not supported by the evidence and the judgment must be set aside.

Notwithstanding Sapp's contentions, we note that the record does not reveal when or how the check was lost.  Rather, it is apparent that Sapp is, at best, merely speculating about the check and the various persons or entities who might have been able to discover the loss.  Moreover, as set forth in the FACTS and the trial court's findings, Sapp's own testimony demonstrates that he was notified of the loss earlier than he claimed. Appellant's App. p. 5-55.

Indeed, Sapp conducted no discovery in this case, and he should not be permitted to rely on his failure to investigate as the basis for his speculation about the check. Moreover, as pointed out by Joines in his testimony, the evidence established that it was

17

more likely that the check was lost by Union Federal Bank when it processed the daily FSB receipts. Tr. p. 62-64, 229-30.

If Sapp believed that FSB was negligent, it was incumbent upon him to prove that negligence. He did not do so and, therefore, Sapp has failed to show that the trial court's ruling was clearly erroneous. See Learman v. Auto-Owners Ins. Co., 769 N.E.2d 1171, 1174 (Ind. Ct. App. 2002).

## B. Personal Liability

Sapp claims that the trial court erred in determining that he should be held personally liable for the shortage in the SF7 account because the transaction was final as defined by the Agreement. Sapp further asserts that the trial court misinterpreted the meaning of the Agreement because in order to constitute an overdraft, "SF7 or Sapp must have written a check or item, or made a withdrawal or transfer from their account for more money than was present in the SF7 account." Appellant's Br. p. 17.

Put another way, Sapp points out that the parties agreed that the August 23, 2005 deposit that Sapp made became final on the second business day after the deposit. Sapp states that to the extent that FSB desired a lengthier delay, it was entitled to do so under the Agreement, but only if it notified Sapp that it was doing so. As a consequence, Sapp maintains that he cannot be held personally liable for the shortage.

In resolving this issue, we note that as a general rule, the interpretation, construction or legal effect of a contract is a question of law to be determined by the trial court. The unambiguous language of a contract is inclusive and binding on the parties

18

and the court, and the parties' intent is determined from the four corners of the document.  Zukerman v. Montgomery, 945 N.E.2d 813, 819 (Ind. Ct. App. 2011).  A contract should be read as a whole, and the language construed so as not to render any words, phrases, or terms ineffective or meaningless.  Village Commons, LLC v. Marion Cnty. Prosecutor's Office, 882 N.E.2d 210, 215 (Ind. Ct. App. 2008).  When the terms of a contract are "clear and unambiguous, courts must give those terms their clear and ordinary meaning."  State Farm Mut. Auto Ins. Co. v. Cox., 873 N.E.2d 124, 127 (Ind. Ct. App. 2007).

FSB argues that Sapp should be personally liable for the shortage in the SF7 account and directs us to his narrow interpretation of the uncollected and non-sufficient funds section of the Agreement.  That section states, in part, that

> **UNCOLLECTED AND NON-SUFFICIENT FUNDS—Your account will be overdrawn if a check or an item is charged against, or a withdrawal or transfer is made from your account for more money than you have in your account.**

Appellant's App. p. 2-16.

We agree that Sapp's interpretation of this section is extremely narrow, and he overlooks the fact that this section is entitled "uncollected and non-sufficient funds." This is the situation here, in that the cashier's check that was deposited by Sapp was uncollected.  Indeed, absent the provisional credit represented by the uncollected check, there were insufficient funds in the account to pay for all of the checks that Sapp had

19

written. Simply put, the account was "overdrawn" within the meaning of the Agreement.

The Agreement further states that

> As used in this document the words "we," "our," and "us" mean the financial institution and the words "you" and "our" mean the account holder(s) and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the account.
> . . .
> LIABILITY—You agree, for yourself (and the person or entity you represent if you sign as a representative of another) to the terms of this account and the schedule of charges. You authorize us to deduct these charges directly from the account balance as accrued. You will pay any additional reasonable charges for services you request which are not covered by this agreement.
>
> Each of you also agrees to be jointly and severally (individually) liable for any account shortage resulting from charges or overdrafts, whether caused by you or another with access to this account.

Appellant's App. p. 5-52.

The evidence indicates that Sapp was the only signer on the account. Appellant's App. p. 5-52. It follows, therefore, that he was the individual with the authority to deposit and withdraw or exercise control over the account. Sapp was also liable for any account shortage resulting from charges or overdrafts, caused by himself or another.

Sapp testified that he was a signer on two A.G. Edwards accounts, and both were in his name. Hence, if Sapp wrote a $100,000 check from the SF7 account and deposited those funds in one of his personal A.G. Edwards accounts, the $100,000 was effectively transferred from the company account to his personal account. Because Sapp had the authority to exercise control over the account, he was liable for any account

20

shortage resulting from charges or overdrafts, whether they were caused by him or another with access to the account.

As noted above, the Agreement's terms state that account holders agree to be liable for any account shortage resulting from a charge or an overdraft. An overdraft exists if a check or an item is charged against or a withdrawal or transfer is made for more money than is in the account. Contrary to Sapp's assertions, there is nothing in the Agreement that limits the account holder's liability to only those situations in which the account holder either wrote a check or withdrew funds from the account. Rather, the Agreement specifically states that liability attaches if any shortage results from any charge or overdraft. Also, it is considered an overdraft when an item is charged against the account. In other words, no check writing or money transferring is required.

We also note that if Sapp's interpretation of the terms of the Agreement was accurate, the account holder would not be liable if a check he or she deposited was returned by the paying bank for insufficient funds—one of the precise circumstances that the section titled "uncollected and non-sufficient funds" intends to protect against. Even accepting Sapp's interpretation of "overdrawn" as requiring an affirmative act such as writing a check or making a withdrawal or transferring funds from the account, Sapp is liable. It is only as a result of Sapp writing checks that there was a shortage in the account after the provisional credit was withdrawn. Had Sapp not written any of those checks, the account would still have held the $125,000 provisional credit and would not

21

have been overdrawn when that credit was revoked. As a result, we conclude that the trial court properly found that Sapp was liable for the shortage in the SF7 account.

We further observe that Sapp maintains that there was no evidence to support the trial court's finding that he wrote a check to A.G. Edwards in response to FSB's apparent threat to set off his accounts. Appellant's Br. p. 14. Sapp contends that if he did not write the check to avoid FSB's set off rights then the check was written in the ordinary course of business, and he can have no liability for any resulting shortage. Id. at 14-15.

However, we believe that Sapp misconstrues the trial court's ruling. In particular, the trial court found Sapp liable for the account shortage in light of his personal liability because those are the terms of the Agreement that Sapp agreed to when he opened the account. Second, Sapp testified that, at that time, he was a signer on the two A.G. Edwards accounts, and both were in his name. Appellant's App. p. 5-52-53. As a result, if Sapp wrote a $100,000 check from the SF7 account and deposited those funds in his personal A.G. Edwards account, the $100,000 was nonetheless transferred from the company account to his personal account. For these reasons, Sapp's claims fail, and Sapp is personally liable for the shortage.

## C. Charge Back to Sapp's Account

Sapp also argues that the trial court erred in determining that FSB preserved its ability to perform a charge back to the account and waited too long to notify him that the check had been lost. Sapp maintains that the transaction had already been "finalized"

22

under the Agreement between the parties, and that FSB delayed the availability of the funds to Sapp. Appellant's Br. p. 15.

Sapp contends that the Agreement states that the parties specifically agreed to deadlines relating to the availability of funds after the deposit of the cashier's check: 1) the next business day; 2) or at most 11 days after the transaction. Appellant's App. p. 6-61; Ex. P. 108. Sapp further maintains that under the terms of the Agreement, FSB only had, at most, eleven days after the deposit within which to notify Sapp. In essence, Sapp argues that if FSB waited a longer period, it forfeited the right to seek reimbursement. And because FSB did not revoke the credit until November 11, 2005, Sapp maintains that the eighty days after the original credit had been granted would "wreak havoc within the business community and unfairly penalize depositors such as SF7 and Sapp." Id.

However, the paragraph of the Agreement on which this argument is based is entitled "Longer Delays May Apply" and is placed within the "YOUR ABILITY TO WITHDRAW FUNDS" section of the Agreement. Ex. P. 108; Appellant's App. p. 2-20.

This section states that

Our policy is to delay the availability of funds from your cash and check deposits. During the delay, you may not withdraw the funds in cash and we will not use the funds to pay checks that you have written. Please remember that even after we have made funds available to you, and you have withdrawn the funds, you are still responsible for checks you deposit that are returned to us unpaid and for any other problems involving your deposit.

Id.

Contrary to Sapp's claims, FSB did not prevent Sapp from withdrawing funds against the provisional credit provided. Nor did FSB delay the availability of the funds

23

past the eleventh business day after deposit. To the contrary, FSB afforded Sapp a provisional credit and it <u>did</u> permit him to withdraw nearly the entire $125,000 before FSB collected on the cashier's check.

In light of these circumstances, Sapp erroneously asserts that once those time periods passed, the provisional credit became final and FSB could no longer obtain reimbursement for the account shortage. In short, this is precisely why this case still exists. If FSB had withheld the funds until collection, there would have been no account shortage. Therefore, the sections of the Agreement relating to delayed availability of funds and relied upon by Sapp are not applicable here.

**D. Lack of Eleven Day Notice Does Not Prevent a Charge Back**

**Under Section 26-1-4-214(a)**

Notwithstanding our discussion above, Sapp asserts that pursuant to Indiana Code section 26-1-4-214(a) (hereinafter referred to as Section 214(a)) of the Uniform Commercial Code, FSB could revoke credit given if notice of the lost check was provided by the midnight deadline set forth in that section or "by the eleven day deadline set out by FSB for unusual types of deposits." Appellant's Br. p. 17. More particularly, Sapp claims that once the time periods allegedly expired, the provisional credit became final and FSB was simply no longer permitted to obtain reimbursement for the account shortage.

In considering these claims, Section 214(a) provides that

If a collecting bank has made provisional settlement with its customer for an item and fails by reason of dishonor, suspension of payments by a bank, or otherwise to receive settlement for the item which is or becomes final, the bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account, or obtain refund from its customer, whether or not it is able to return the item, if by its midnight deadline or within a longer reasonable time after it learns the facts it returns the item or sends notification of the facts. If the return or notice is delayed beyond the bank's midnight deadline or a longer reasonable time after it learns the facts, the bank may revoke the settlement, charge back the credit, or obtain refund from its customer, but it is liable for any loss resulting from the delay. These rights to revoke, charge back, and obtain refund terminate if and when a settlement for the item received by the bank is or becomes final.

In construing the above, there is nothing in Section 214(a) that prohibits FSB from revoking the provisional credit. To the contrary, this section specifically states that FSB <u>can</u> revoke the credit after the midnight deadline and after a longer reasonable period of time has passed, so long as the item received by the bank was not finally settled. FSB did not receive payment for the check because it was lost. Hence, there was no final settlement and FSB was free to revoke the provisional credit.

That said, we reject Sapp's interpretation of Section 214(a) that the August 23 deposit by Sapp on behalf of SF7 had finalized because a reasonable time had passed when applying the provisions of the statute. Thus, FSB has not forfeited its rights and was not prohibited on November 11 from charging back the SF7 account and seeking additional liability from Sapp. The cashier's check that Sapp deposited remained uncollected. Therefore, absent the provisional credit represented by the uncollected check, there were insufficient funds in the account to pay for all of the checks that Sapp had written. Thus, as stated above, the account was overdrawn.

25

Finally, it is apparent that Sapp has failed to prove that he suffered any loss in this instance. In fact, Sapp alleges that "the requirement of legal damages is not necessary under Indiana Code Section 26-1-4-214." Appellant's Br. p. 19. Sapp is simply asserting that as a result of the delay in notification, Sapp was unable to determine the third party on whom the cashier's check was written. In other words, FSB points out that Sapp is arguing that because FSB took nearly forty days to notify Sapp of the loss, too much time had passed and Sapp was not able to remember the identity of the bank that issued him the $125,000 check.

It is axiomatic that the burden of proving damages rests with the party asserting the issue. Welborn v. Society for Propagation of Faith, 411 N.E.2d 1267, 1270 (Ind. Ct. App. 1980). Here, Sapp did not introduce any evidence that the trial court ignored or failed to consider, and he does not argue that he presented evidence of loss to the trial court. Rather, Sapp merely asserts that as a result of FSB's delay in notification that he was not able to determine the third party on whom the cashier's check was written. Put another way, Sapp contends that because FSB took too much time to notify Sapp of the loss, he was no longer able to recall the identity of the bank that issued him the $125,000 check.

To have prevailed on this theory, Sapp would had to have introduced evidence to the effect that the passage of forty days or so resulted in his loss of memory and that he was otherwise unable to discover the identity of the issuing bank. Here, Sapp not only failed to introduce evidence as to the impact of the additional forty days, but the

26

evidence demonstrated that Sapp likely had the ability to locate the name of the issuing bank but simply failed to avail himself of that opportunity.

As discussed above, Sapp maintained multiple bank accounts and his investigation of the identity of the issuing bank consisted of visiting only a few of those institutions and inquiring as to whether they had records of issuing him a cashier's check. More importantly, as FSB emphasizes, Sapp did not contact those banks until well after he was notified of the lost check.

The evidence also revealed that Sapp admitted that, even though he knew the identity of the bank that wrote the $80,000 check from which the check was created, he did not contact that bank to determine if that check had cleared and, if so, which bank had processed the check. Id. at 48. Thus, the record demonstrates that Sapp did not introduce any evidence in support of, or show any delay, that might have resulted in his loss of memory. For all of these reasons, we conclude that the trial court did not err in issuing the charge back to Sapp's account.

### E. Attorney Fees

Sapp argues that the trial court erred in ordering him to pay FSB's attorney fees. More particularly, Sapp contends that the Agreement does not permit such an award in these circumstances and maintains that FSB did not provide a foundation for an award of its fees. Sapp also contends that he was denied the opportunity to be heard on the issue of attorney fees in violation of his right to due process.

27

Although Sapp notes that FSB's affidavit offers evidence of the specific tasks that the attorneys performed along with the fees that were charged, he claims that FSB presented "no evidence as to any legal basis for such recovery." Appellant's App. p. 23. Thus, Sapp contends that there is no basis to recover under the Indiana Statutes or the Agreement between the parties. Id.

We initially observe that in general, litigants must pay their own attorney fees, and therefore, an award of attorney fees is not permitted unless a statute, agreement, or stipulation authorizes such an award. Harco, Inc. of Indianapolis v. Plainfield Interstate Family Dining Assocs., 758 N.E.2d 931, 940 (Ind. Ct. App. 2001). Put another way, recovery is permitted if there is a statute or legislative action that creates a right to attorney fees in favor of the prevailing party. Secondly, the prevailing party may recover attorney fees in breach of contract actions where the parties have agreed to terms that would give rise to an award of such fees. West Cent. Conservancy Dist. v. Burdett, 920 N.E.2d 699, 702 (Ind. Ct. App. 2010).

In this case, there was no statutory action raised in the trial court that would permit FSB to recover its fees if it prevailed in the action. However, the "Uncollected and Non-sufficient Funds" section of the Agreement states an account is overdrawn "if a check or an item is charged against or a withdrawal or transfer is made from your account for more money than you have in your account." Ex. p. 104. And the "Liability" section provides that the account holder "agrees to be liable for any account shortage resulting from charges or overdrafts. . . ." Tr. p. 103. The above sections then

28

state that the account holder will "reimburse the Bank immediately upon demand for the dollar amount your Account is overdrawn and related costs, expenses <u>and reasonable attorney's fees (including the cost of any attorney employed by us</u>)" and that the account holder will be liable for "<u>our costs to collect the deficit including, to the extent permitted by law, our reasonable attorneys' fees.</u>" <u>Id.</u> at 103 (emphases added). In light of these provisions, we conclude that the trial court did not err in ordering to pay FSB's attorney fees that it incurred in this action.

## F. Due Process and Award of Attorney Fees

In the alternative, Sapp claims that FSB should be precluded from recovering its attorney fees because he was improperly deprived of the opportunity to be heard on this issue. Thus, Sapp argues that the trial court should have held a second hearing with regard to this issue.

First, we note that Sapp not only agreed to bifurcate the attorney fee issue, but the record shows that he was afforded the opportunity to argue that issue both during trial and after the entry of judgment. Indeed, Sapp affirmatively stated that he had no objection to "handle [the] issue of attorney fees subsequent to the court's findings in this matter." Tr. p. 8.

In light of the above, the only issue to be decided following the trial concerned the amount of fees in the event that FSB prevailed on its claim for breach of contract in light of the Agreement's terms.

29

Also, Sapp <u>did</u> argue the issue before the trial court because in his proposed findings, he maintained that

> 21. The provisions of the Disclosure Agreement entitled "Liability" on Page 2, and "Un-collected or Non-sufficient Funds" on Page 4, are the only two provisions that mention circumstances by which Flagstar may recover reasonable attorney fees. These provisions apply to specialized, identified situations and not applicable to the facts at bar.

Appellant's App. p. 19.

We further note that Sapp filed an objection to the affidavit for attorney fees in the trial court, where these same arguments were raised. Appellant's App. p. 7-101. Similarly, Sapp cannot successfully claim on appeal that the award of attorney fees was unreasonable.

More precisely, pursuant to the trial court's order, FSB submitted its affidavit in support of attorney fees. Sapp subsequently filed an objection to <u>any</u> fee award, but he did not object to the reasonableness of the fees themselves. And the trial court placed no limitations on the content of Sapp's response. In other words, Sapp could have objected to the amount of the fee request, but he chose not to do so. Sapp also did not request a hearing before the trial court.

Finally, we note that the reasonableness of fees is a matter left to the trial court's sound discretion. <u>Kotsopolous v. Peters Broadcast Eng'g, Inc.</u>, 962 N.E.2d 97, 109 (Ind. Ct. App. 2011). Thus, while Sapp would certainly have been permitted to lodge any objections that he may have had to the hourly rate charged or the time incurred, the

30

ultimate decision on the reasonableness of the overall fees fell within the trial court's discretion.

As noted above, following the bench trial on February 27, 2013, Sapp expressly sought a finding with regard to his liability for attorney fees under both the "uncollected and non-sufficient funds" and "liability" sections of the Agreement. Contrary to his contentions, Sapp argued whether a finding of personal liability and whether an overdraft occurred within the meaning of the Agreement would have obligated him to pay attorney fees. Appellant's Br. p. 12-13, 24-26. Thus, Sapp's contention that he was denied due process of law fails.

Similarly, Sapp does not prevail on his claim that the trial court erroneously decided that FSB was entitled to an award of appellate attorney fees. See Humphries v. Able, 789 N.E.2d 1026, 1036 (Ind. Ct. App. 2003) (holding that when a contract term provides that attorney fees are recoverable, appellate attorney fees may also be awarded).

While we affirm the trial court's order of attorney fees that the trial court awarded in the amount of $108,423.50, we agree with FSB's request that this cause must be remanded for further proceedings so that the trial court may conduct a hearing and calculate the proper amount of appellate attorney fees that should be awarded.

CONCLUSION

In light of our discussion above, we conclude that the trial court properly determined that FSB could issue a charge back to Sapp's account in accordance with the

Agreement and the Uniform Commercial Code. We also find that the trial court correctly found Sapp personally liable for the amount of the check that had been lost.

Although we affirm the amount of attorney fees that the trial court awarded to FSB, we remand this cause for further proceedings so that the trial court may decide the amount of appellate attorney fees to which FSB may be entitled.

The judgment of the trial court is affirmed and remanded.

FRIEDLANDER, J., and BARNES, J., concur.